Curia, per

O’Neall, J.
The charter of the South Carolina Bank (a) after directing that the payment of *343 $15,000, as a bonus, should be a condition precedent, to its being incorporated, or deriving any benefit from the charter, provides, “ and in consideration of said payment, to be relieved from all taxes during the time for which it is hereby incorporated.” It authorizes the Bank to hold real and personal estate, including the capital stock, to the amount of $1,500,000. The charter of the State Bank, (b) in consideration of a like sum already paid under the Act of 1801, (as I presume, for the charter is silent) provides “that the said corporation, and stock thereof, shall be relieved from the payment of all taxes during the time for which it is hereby incorporated.” This Bank is authorized to hold real and personal estate, including its capital stock, 800,000, to the amount of $2400,000. The charter of the Union Bank, (c) after making the payment of the bonus of $20,000, on or before the 1st. September, 1811,' a condition precedent to incorporation or to any benefit or advantage from it, provides, “and in case the said Bank shall, on or before the day aforesaid, pay, or cause to be paid, the .aforesaid sum of $20,000, the said Bank shall be, and is hereby declared to be, exempt from all taxes during the time for which it is hereby intended to be incorporated.” The Union Bank is, by its charter, authorized to hold and possess real and personal estate, inclusive of the capital stock, to the amount of $3,000,000. The charter of the Planters’ and Mechanics’ Bank, (d) provides, “ that the Bank hereby intended to be incorporated, shall not be so incorporated, or derive any benefit or advantage from any of the clauses or provisions in this Act contained, unless it shall transfer, or cause to be transferred, to the Treasurer of the Lower Division, for the benefit of the State, eight hundred shares of the stock of the said Bank, on or before the 1st. November,” 1811. In the last clause it provides, “that the said Bank shall be, and is hereby declared to be, exempted from all taxes for the time it is by this Act incorporated.” The charter authorizes it to hold real and personal estate, including its capital stock of $1,000,000, to the amount of $3,000,000. These charters have, either at or before the *344 time limited for their expiration, been renewed, and the Banks, for such renewals, have each paid the sum required as a bonus by the Legislature. From the charters of these different Banks, it appears that there is some difference in the words used exempting them from taxation : they all, however, mean the same thing, a general exemption. Whether that exemption extends to any thing else than the corporate body and its capital stock or shares, is one of the questions now to be considered. If it does, then it is contended, by the city council, that it cannot exempt the Banks from the payment of assessments on the real estate, respectively held by them, as rated and assessed by the ordinance ordained by the city council under the charter of the city.
I am at a loss to discover any good reason why the exemption of a Bank by its corporate name from all taxes, should not exempt its property. A corporation is, it is true, a body in law ; but it is a mere legal creation. Of itself, it possesses neither form, shape or substance upon which a tax could be imposed. Declare a corporation liable to taxation, and if it has no property upon which the tax can be levied, the revenue to be derived from such a source would not be worth the paper upon which the law is written. To be intended for any thing else than a mockery, an exemption of a Bank from taxation must extend to something else than the Bank. For the Bank is nothing but the body corporate and politic in law. It has legal existence ; but strip it of its banking funds and property, and I apprehend it would be difficult to find the corpus. An exemption of a citizen, without qualification, from all taxes, seems to me necessarily to exempt both his person and property from taxation ; and more especially in a State where property is the only source looked to from which revenue is to be derived, and where a capitation tax upon free white males has not hitherto been imposed. The right of property is one which belongs to every free person. From it he is liable to contribute, by way of taxes, whatever sum the State may think proper to declare it liable to pay. If she should think proper to exempt him from taxation, does it not follow that this general *345 grant releases him from every liability that he was or might be under to pay taxes ? If it does, and that seems too clear to be doubted, can it be that, because the Legislature might, by sheer possibility, impose a capitation tax, it could be construed to be only a release from his personal, and not from his relative, liability arising out of his ownership of property ? Such a notion presents rather too metaphysical a distinction to be allowed to enter into a construction of an Act of the Legislature. What is intended, in the case supposed, of the exemption of a citizen by an Act of the Legislature from the payment of all taxes 1 is the true question. This is to be ascertained from the words used, in their general acceptation and popular meaning, and when so construed, there is no difficulty in saying that it must exempt both him and his property. For that would be the conclusion of every mind which looks to the words, and which had not tasked ingenuity to endeavor to give them some other possible meaning and effect. If the exemption by his name, would exempt himself and property, I apprehend that the exemption of a corporation by its corporate name must have the same effect. For, like him, it is known by its name, and this, answering as a description in both instances, cannot, in one, have more general effect than in the other.
If there could be any doubt as to the effect of an exemption of the Bank by its corporate name, it is certainly much lessened when it is recollected that in the charter of each of the Banks, each is allowed to hold real and personal estate (including its capital stock) to a given amount. This was part of the very privileges conferred on the corporation by its charter, and, as being part of that which belonged or might belong to the corporation, it is fair to conclude, that for this privilege, among others granted, and for the exemption from taxes on this capital sum, the bonus was paid. It has not been pretended that the capital or original shares of the stockholders, as so much money funded, was not exempted from taxation. If this is exempt, why not the whole property of the Banks ? For every thing which belongs to the corporation is the common stock of the company. The words capital *346 stock, used in the charters, mean nothing more than the original sum upon which the Bank commences. It may be increased by acquisitions of property to the extent pointed out in the chatter. Or it may, itself, in the course of the banking operations, be partially changed into property ; which, in its turn, is changed into money, and thus again becomes, in the sense contended for, stock. I should define stock, as contradistinguished from capital stock, that which belongs to the whole banking company, and which cannot be withdrawn from it during its corporate existence. So soon as property is acquired in the name of the Bank, it is held for all the stockholders, and until changed into money, there can be no dividend of the whole of it as profits. Hence, it must be regarded as stock while it remains in kind, as much as the original shares.
In the charter of the State Bank, ‘‘the corporation and the sioc/c thereoff (not the capital stock) are exempted from the payment of all taxes. According to my notion of stock, this would exempt the $2,400,000 which that Bank is authorized to hold, from State taxation. If this is a fair construction of that charter, and that it is I do not doubt, the same construction must apply to all, for it is obvious that it was intended to confer the same privileges of exemption on each. If the Banks, (including under this name the whole of their real and personal estate) are exempted from taxes to be imposed by the State, are they also exempted from assessments on their real or personal property by the city council? Ail the power of the city council to make assessments, arises from the grant of that power by the Legislature, and is subject to this qualification ; “ nor shall they make any by-laws repugnant to the laws of the land.” As has been well observed by our learned brother Bay, if the ordinance making the assessments operates as a tax, it is directly at war with the Acts of the Legislature exempting the Banks from the payment of all taxes ; and is, therefore, void. But without pursuing this idea, I think it is demonstrable that, under the affirmative words of the charter giving the power to the city council to make assessments, they have no right to *347 assess the property of the Banks. The city council, by the charter of the city, are vested “with full power and authority to make such assessments on the inhabitants of Charleston, or those who hold taxable property within the same, for the safety, convenience, benefit and advantage of the said city.” In order to ascertain the nature and extent of this grant, it has been supposed necessary to ascertain the meaning of the term assessments used in the charter; and it has been attempted to distinguish it from taxes. But I am satisfied that they both mean, that sum which a man pays as his quota or share of the expenses of the government under which he lives, according to its requisitions on him by Act or Ordinance. The term assessments, would just as well describe the sum which a citizen annually pays to the State under the Acts to raise supplies, as the term taxes. In the tax Act of 1788, the following words are used, “or the tax to be assessed by virtue of any tax Act hereafter to be passed” (fee: if the tax is to be assessed, the amount to be paid is ascertained by assessing the value of the property, ii the tax is an ad valorem one, on which it is imposed, and the result would be, properly speaking, an assessment. So, also, in this place, there is an assessor for the State, whose duty consists in ascertaining the value of the taxable property, preparatory to the collector’s duty of receiving. The taxes paid according to his valuation are properly assessments on the property. This duty is devolved on the tax collectors throughout the rest of the State ; and where property is not returned, or being returned, (as in the case of houses and lots) but no value is fixed, the tax collector literally makes an assessment, in the first case, when he double taxes, and in the other, when he values the property and ascertains the tax from it. But all ad valorem taxes are nothing but assessments; the law classes and fixes a value on lands ; the tax collector takes that valuation as the basis of his calculation, to ascertain how much must be paid according to the Act to raise supplies ; the result which he produces is an assessment, according to the quality and quantity of the land. The assessments made under the ordinances of the city council are, I presume, in all cases *348 upon real property in the city ad valorem, and are, therefore, precisely in character and effect the same as taxes imposed by the State upon property of the same description. The term assessment, according to its legal definition, includes general taxes, corporation dues and parochial rates. These views satisfy my mind that the word assessment, is but another name for taxes; and I have gone more at large into the reasons for that conclusion from respect to the opinion of the able and learned Recorder of the city (who I understand has come to a different conclusion) than I should otherwise have done. For whether assessment and tax are, or are not, synonimous terms, is wholly immaterial in the view which I now pro'pose to take of the power of the city council to make the assessments under consideration.
On whom can the city council make assessments 1 “ On the inhabitants of Charleston, or those who hold taxable property within the same,” is the answer of the charter and in its own words. Is a Bank an inhabitant (a) of Charleston ? Surely not! It is a body in law, but not in fact; it exists altogether in paper — its charter — and cannot be an inhabitant living and dwelling in the city, In that character, therefore, it is not liable to be taxed by the city council. Do Banks hold taxable property within the city? What is meant by the words <!taxable property,” in the charter of the city ? Do they mean property which was liable to be taxed at the time of enacting the city charter; or property which is liable to be taxed by the State at the time the city council shall declare it liable to assessment ? The latter is the obvious and necessary meaning. If so, the question is presented, in limine, was the property of the Banks liable to taxation by the State at the time the city ordinance directing the assessment was ordained? We have already seen that the charters enacted by the State Legislature, long before the city ordinance was ordained, exempted them and their property from State taxation ; and hence, their property not being *349 taxable by the State, was not liable to the city assessments. For these reasons we think the prohibitions were properly ordered by the Judge below ; and the motion to reverse his decision is dismissed.
Johnson, J. concurred.

 8. Stat. 4.

 8 Stat. 12. (c) 8 Stat. 16. (d) 8 Stat. 21.

 See Cromwell vs. Insurance Company, 2 Rich. 516, where it is said that a corporation be an inhabitant or resident.